IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| C.S., a Minor, by his Parents and Natural Guardians, Ann Munson Steines and Michael Steines, | : : : : | Case No. 1:14-cv-525 |
| Plaintiffs, | : : | Judge Susan J. Dlott |
| v. | : : | Order Denying Permanent Injunction and Vacating Order Granting Preliminary Injunction |
| Ohio High School Athletic Association, | : : | |
| Defendant. | : | |

This matter is before the Court on Plaintiffs' request for a permanent injunction. C.S., a minor with a disability, lives in the state of Kentucky with his parents, Ann Munson Steines and Michael Steines, and his sister. C.S. attends high school at the Summit Country Day School ("Summit"), a private school located in Cincinnati, Ohio. C.S. desires to play soccer on Summit's high school team, but Bylaw 4-6-3 of the Ohio High School Athletic Association ("OHSAA"), with a few exceptions not applicable here, prohibits students whose parents do not live in Ohio from participating in interscholastic athletics. The Steines assert that enforcement of the in-state residency rule, and the refusal to grant C.S. a waiver from the rule as a reasonable accommodation, constitutes disability discrimination against C.S.

In 2014, upon motion from the Steines, this Court preliminarily enjoined the OHSAA from enforcing or threatening or seeking to enforce OHSAA Bylaw 4-6-3 against C.S. (Doc. 5 at PageID 80; Doc. 13 at PageID 228.) C.S. then proceeded to play soccer for the Summit team in the fall of 2014. The Steines now request a permanent injunction prohibiting OHSAA from enforcing Bylaw 4-6-3 against C.S. The Court held an evidentiary permanent injunction hearing on this matter on April 28, 2015. The parties attempted to negotiate a settlement following the

1

hearing, but they filed post-hearing briefs on June 30, 2015 after the settlement talks stalled. This matter is ripe for resolution. For the reasons that follow, the Court will deny a permanent injunction.

**I.  FACTUAL BACKGROUND**

The relevant facts are largely uncontested by the parties. The Court will cite only those portions of the record where the evidence was contested or otherwise was the subject of disagreement.

**A.  Educational Background of C.S.**

The Steines are residents of Villa Hills, Kentucky. Their daughter attends parochial school in Kentucky. Their son, C.S., attended kindergarten in Kentucky. He then transferred to the Springer School and Center ("Springer") in Cincinnati, Ohio for first grade in the 2005–2006 school year after he was diagnosed with Attention Deficit/Hyperactivity Disorder ("ADHD") and an auditory processing issue. The Steines's decision to enroll C.S. at Springer in Ohio was prompted by a desire to send C.S. to a school best equipped to address his learning disabilities. Springer is one of fewer than two dozen schools nationwide that offers an education for first through eighth grades exclusively to children with learning disabilities. Class sizes are limited to nine to thirteen students and two teachers are assigned to each class at Springer. Springer tailors its teaching methods and learning techniques toward each child's specific learning disabilities. Because of its specialized nature, Springer draws students from Ohio, Kentucky, and Indiana.

Springer provided the Steines with detailed progress reports for C.S. at the end of each semester. The school held parent/teacher conferences each December during which the staff made recommendations as to whether C.S. should continue his education at Springer for the following school year. During C.S.'s sixth grade year, the teachers and staff at Springer opined

that C.S. could attend a mainstream school for the seventh grade, but that he would need additional educational support to succeed. Accordingly, the Steines researched different schools in the greater Cincinnati and northern Kentucky area. They ultimately concluded that St. Ursula Villa in Cincinnati would be the best fit for C.S.

C.S. attended St. Ursula Villa for seventh and eighth grades. St. Ursula Villa also had small class sizes, some as small as six to eight students, and only forty children per grade level. St. Ursula Villa permitted the use of a laptop in class, an education aid that was useful to C.S. C.S. took a course called "communication arts" in lieu of a foreign language, during which he worked with a learning intervention specialist to review challenging material, organize homework, and prepare for tests.

During C.S.'s eighth grade year, the Steines researched high schools for C.S. including Summit, St. Xavier High School, and Archbishop Moeller High School in Ohio and Holy Cross High School in Kentucky. Their final choices appeared to be Summit and Holy Cross. The evidence presented to the Court demonstrated that both Summit and Holy Cross could provide C.S. with the educational services he required to accommodate his learning disabilities.

Michael Steines testified that the Steines chose Summit over Holy Cross because they subjectively believed Summit has a better resource program and a better college placement program. Michael Steines testified as follows at the permanent injunction hearing:

> There were two main reasons. One is that Summit most closely mirrored the learning environment at Saint Ursula Villa which was very helpful to Chuck in transitioning from Springer to a, quote, unquote, normal school. Smaller class sizes, the existence of [what] Summit they call it a resource program; at Saint Ursula Villa it was the communication arts class.
>
> And secondarily -- the other reason, not necessarily secondarily, is the college placement program. It was clear to us after visiting Summit before Chuck went to school there that the resource program had a great and complete understanding of the accommodations offered by colleges and universities that we would be

3

> considering. We didn't see any of that at Holy Cross. It just -- it wasn't there. When we talked to the folks at Holy Cross about the universe of schools that their students consider after high school, it was very clear to us that it was a much more narrow universe than that considered by students at The Summit.
>
> Also, the physical layout at Holy Cross was different in that the kids who went to the analogous resource program at Holy Cross literally had to walk across a street to a house that was purchased by the school, and they receive their support and accommodations there. It seemed to us that they weren't as integrated into the student body as they were at Summit.

(Doc. 23 at PageID 839–40.) Ann Munson Steines later testified that the resource program at Summit involved a set number of students each day, while the number of students using the resource program at Holy Cross could vary each day from five to fifteen students. (*Id.* at PageID 866.)

Michael Steines also testified that C.S. benefits from the ability to use a laptop at Summit. (*Id.* at PageID 844.) He takes notes on it and uses a program called Smart Notes to access his teacher's typed class notes. (*Id.*) Finally, Michael Steines stated that C.S. benefits from the services of a biology tutor at Summit. (*Id.* at PageID 848.)

Importantly, however, the Steines conceded that the resource program offered at Summit was not unique in the services it could provide to disabled students. Michael Steines admitted that Holy Cross provides the same services as Summit, but only in a separate building. (Doc. 23 at PageID 849, 852–53.) Ann Munson Steines testified that the Steines had acknowledged in a February 10, 2014 letter to the OHSAA that Holy Cross could provide the educational resources that C.S. needed:

> There is one high school in Northern Kentucky with a support program, technology platform and individual, caring attention that could work for [C.S.]: Holy Cross High School in Latonia[, Kentucky]. However, their [*sic*] academic reputation and college placement program do not compare favorably with The Summit.

4

(Doc. 22-1 at PageID 464.) The college placement program which impressed the Steines is offered to all students beginning in ninth grade, not just to students with disabilities. (Doc. 23 at PageID 841.)

Michael Steines tried to draw an unfavorable comparison between the size of the resource program at Holy Cross as compared to the size of the Summit program, but he had to walk back that testimony. He originally stated that Summit had only eight students in the resource program in each grade, but that Holy Cross had as many as forty to fifty students in its resource program. (*Id.* at PageID 853.) He later admitted that he might have been comparing Summit's "per grade" number of students to Holy Cross's total number of students. He agreed that it was "possibl[e]" that Summit had thirty-two students in its resource program compared to Holy Cross having forty students in the resource program, a difference of only two students per grade level. (*Id.* at PageID 857–58.) Michael Steines stated that he did not know how many learning specialists Holy Cross used to oversee the resource program. (*Id.* at PageID 858.)

Regarding the laptop issue, the Steines stated that C.S. could use a laptop at Holy Cross. Michael Steines stated that he did not ask Holy Cross whether the school used the Smart Notes program. (*Id.* at PageID 859.) Ann Munson Steines testified at the hearing that Holy Cross did not have a "technology platform." (*Id.* at PageID 868.) However, this testimony was in direct contradiction to what she told the OHSAA when she stated in the in the February 10, 2014 letter that Holy Cross did have a "technology platform." (*Id.* at PageID 871; Doc. 22-1 at PageID 464.) In any event, Holy Cross could have provided C.S. with access to his teacher's handwritten notes, even if it could not provide an electronic copy of the teacher's typed notes. (*Id.* at PageID 868.) Finally, Michael Steines conceded that other schools in Ohio and Kentucky could have provided C.S. with tutoring services if needed. (*Id.* at PageID 848.)

C.S. had a successful first year at Summit academically.  He intends to return to Summit for his sophomore year of high school during the 2015–2016 school year.

**B.     C.S.'s Participation in Soccer**

The Steines believe that C.S.'s participation in sports in general and in soccer in particular has positively impacted his social skills, self-image, behavior, attendance at school, and academic performance.  While C.S. attended St. Ursula Villa, he played on the school's soccer team.[1]  He also played club, or "select," soccer for one year from July 2013 through May 2014.

C.S. played soccer for Summit during his freshman year in 2014 pursuant to Orders issued by this Court temporarily enjoining the OHSAA from enforcing Bylaw 4-6-3 against C.S. (Doc. 23 at PageID 846.)  His team had a successful season reaching the state semi-final game in the tournament.  (*Id.*)  C.S. desires to continue playing soccer for Summit during the upcoming 2015–2016 school year.

**C.     The OHSAA and the In-State Residency Rule**

The OHSAA is a nonprofit, voluntary, unincorporated association of approximately 828 public and private high schools and middle schools serving seventh and eighth grade students. More than 80% of the member schools are public.  Summit is among its voluntary members. Member schools' athletic programs are governed by the OHSAA's bylaws which were voted on and adopted by the member schools' representatives.  The OHSAA's Board of Directors has the power to propose amendments to the bylaws through a referendum process.  Under certain circumstances, the Board also can bypass the referendum process to make temporary changes to the bylaws to bring them into conformance with state and federal law until more permanent amendments can be proposed and voted on during the next referendum cycle.

---

[1]  St. Ursula Villa is not a member of the OHSAA.

6

OHSAA Bylaw 4-6-3, appearing in the section of the bylaws pertaining to "Student Eligibility," provides that students "whose parents reside outside the state of Ohio will be ineligible for interscholastic athletics in a member school." (Doc. 2-1 at PageID 36.) When asked to explain the purpose of that rule, OHSAA Assistant Commissioner Roxanne Price testified that it promotes an equal playing field by preventing unfair recruitment of the best players, generally by private schools. (Price Dep., Doc. 12 at PageID 160–61.) There are ten exceptions to the in-state residency rule. Seven of the exceptions (numbers 1, 2, 6, 7, 8, 9, and 10) deal with situations where the child lives or has lived in Ohio. None apply to permit C.S. to play interscholastic sports for Summit.[2]

The Steines and Summit have requested that the OHSAA make an exception to the in-state residency rule for C.S. as a reasonable accommodation of his disability. The Steines discussed the potential eligibility issue with Summit's Athletic Director, Greg Dennis, shortly after deciding to send C.S. to that school. In early February 2014, Dennis contacted Daniel B. Ross, Ph.D., Commissioner of the OHSAA, to request an accommodation to the in-state residency rule for C.S. Dennis attached a letter from the Steines to his request. In their letter, the Steines outlined C.S.'s learning disabilities, his attendance at Springer, and the positive impact athletics has played on his social skills and self-image. (Doc. 22-1 at PageID 463–66.) They also noted their understanding that OHSAA Bylaw 4-6-3 does not include an exception for students diagnosed with learning disabilities. Dr. Ross forwarded the request to Assistant Commissioner Price, who is in charge of evaluating eligibility issues. Price had no concerns

---

[2] Exception 3 provides that "[a] student who enrolls at first grade level in a school consisting of grades 1-12 and who maintains continuous enrollment shall be eligible for interscholastic athletics in grades 7-12 in that school regardless of place or state of residence of parents." (Doc. 2-1 at PageID 36.) Price testified that the term "school" in that exception actually refers to a school *system* or *district*, and that the exception therefore would include any public or nonpublic school system that offers education from grades one through twelve. (Price Dep., Doc. 12 at PageID 162–63, 165.) Exception 3 does not apply to C.S. because he has attended three unrelated schools since first grade.

7

about improper or unfair recruitment efforts in C.S.'s case, but she denied the request for accommodation on the basis that none of the exceptions to the in-state residency rule applied to C.S. The Steines formally were notified of the denial via a letter dated February 24, 2014 from Price. The OHSAA has maintained its position that C.S. is ineligible to play OHSAA interscholastic athletics despite the repeated requests from the Steines for a waiver from Bylaw 4-6-3. The OHSAA has not proposed a referendum to its membership to address the impact of Bylaw 4-6-3 upon C.S. (Doc. 23 at PageID 847, 977.)

**D.     Procedural History**

Ann Munson Steines and Michael Steines initiated this lawsuit on behalf of their son, C.S., on June 25, 2014 by filing a Verified Complaint. (Doc. 1.) They asserted claims for disability discrimination and failure to accommodate under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111 *et seq.*, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.*, and a claim for disparate impact under the ADA. (*Id.* at PageID 5–8.) As stated earlier, the Court issued a Temporary Restraining Order (Doc. 5) and then an Order Granting Preliminary Injunction (Doc. 13) in favor of the Steines which allowed C.S. to play soccer for Summit during the 2014 season.

The Steines now seek a permanent injunction enjoining "OHSAA from enforcing or threatening or seeking to enforce Bylaw 4-6-3 against Plaintiffs" and ordering OHSAA "to adopt an additional exception to Bylaw 4-6-3 that will allow C.S. to play sports in Ohio." (Doc. 25 at PageID 1059.)

**II.     LEGAL STANDARDS FOR PERMANENT INJUNCTIONS**

The standards for preliminary injunctions and permanent injunctions are essentially the same with the exception that for a permanent injunction the plaintiff must show actual success on

the merits rather than the likelihood of success. *Am. Civil Liberties Union of Ky. v. McCreary Cnty., Ky.*, 607 F.3d 439, 445 (6th Cir. 2010) (citing *Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 546 n. 12 (1987)). To secure a permanent injunction, plaintiffs must demonstrate: "(1) that they will suffer a continuing irreparable injury if the court fails to issue an injunction; (2) that there is no adequate remedy at law; (3) that, considering the balance of hardships between the plaintiffs and the defendants, a remedy in equity is warranted; and (4) that it is in the public's interest to issue the injunction." *Sherfel v. Gassman*, 899 F. Supp. 2d 676, 708 (S.D. Ohio 2012), *aff'd sub nom.*, *Sherfel v. Newson*, 768 F.3d 561 (6th Cir. 2014).

### III. ANALYIS

The Steines seek to prove that the enforcement of OHSAA Bylaw 4-6-3 has the effect of discriminating against C.S. on the basis of his disability in violation of the Rehabilitation Act of 1973 and of Titles II and III of the ADA. The OHSAA disputes only that its enforcement of Bylaw 4-6-3, the in-state residency rule, against C.S. constitutes disability discrimination. It does not otherwise contest that a permanent injunction would be an appropriate remedy if the Court determines that enforcement of the rule is disability discrimination. (Doc. 18 at PageID 404.)

#### A. Overview of Disability Law

"[T]he ADA forbids discrimination against disabled individuals in major areas of public life, among them employment (Title I of the Act), public services (Title II), and public accommodations (Title III)." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

Title II of the ADA only applies to public entities. *Id.*; *see also City and Cty. of San Francisco, Cal. v. Sheehan*, 135 S. Ct. 1765, 1773 (2015). A qualified individual with a disability is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). To make out a claim under Title II, a plaintiff ordinarily must establish that (1) he has a disability; (2) he is otherwise qualified; and (3) he is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program because of his disability. *Jones v. City of Monroe, Mich.*, 341 F.3d 474, 477 (6th Cir. 2003); *see also Lewis v. Humbolt Acquisition Corp., Inc.*, 681 F.3d 312, 321 (6th Cir. 2012) (stating that the ADA bars discrimination "because of" a person's disability such that a plaintiff must prove "but for" causation).

Likewise, Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182.[3] To establish a prima facie case of discrimination under Title III of the ADA, "a plaintiff must demonstrate that (1) he has a disability; (2) the defendant owns, leases, or operates a place of public accommodation; and (3) the defendant discriminated against him on the basis of his disability in the full and equal enjoyment of that place of public accommodation." *Snyder v.*

---

[3] The OHSAA disputes that it is a covered entity under either Title II or Title III of the ADA. (Doc. 24 at PageID 1013–16.) The Court need not and does not determine in this Order whether OHSAA is a covered entity under the ADA.

10

*Lady Slings the Booze, LLC*, No. 3:12-CV-00659, 2014 WL 7366665, at *2 (W.D. Ky. Dec. 24, 2014).

The Rehabilitation Act prohibits discrimination against individuals with disabilities, "solely by reason of his or her disability[,]" in federally funded programs or activities. 29 U.S.C. § 794(a);[4] *see also Andrews v. Ohio*, 104 F.3d 803, 806 (6th Cir. 1997) (interpreting the Rehabilitation Act). Because "[t]he analysis of claims under the [ADA] roughly parallels those brought under the Rehabilitation Act . . . cases construing one statute are instructive in construing the other." *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459–60 (6th Cir. 1997) (internal citations and quotation marks omitted).

The Court will assume without deciding, for purposes of this Order, that the Rehabilitation Act and either Title II or Title III of the ADA are applicable to the OHSAA.

**B.     C.S.'s Disability and the Request for a Reasonable Accommodation**

The OHSAA concedes for purposes of this suit that C.S. has a disability. The Steines allege that the OHSAA is violating the ADA and the Rehabilitation Act to the extent that it will not grant C.S. a waiver of Bylaw 4-6-3, the in-state residency rule, so that he can play on Summit's soccer team. Over the past two decades, a number of student athletes like C.S. have alleged that the application of facially neutral eligibility requirements such as age limits and semester limits, which resulted in their exclusion from high school athletic competition, constituted violations of the ADA. *See*, *e.g.*, *Washington v. Ind. High Sch. Athletic Ass'n*, 181 F.3d 840, 842 (7th Cir. 1999) (semester limits in Indiana); *McPherson*, 119 F.3d at 460 (semester limits in Michigan); *Sandison v. Mich. High Sch. Athletic Ass'n., Inc*., 64 F.3d 1026, 1028 (6th

---

[4] The Court is aware of no evidence establishing that the OHSAA is federally funded. The Steines appear to base their contention that OHSAA is subject to the Rehabilitation Act on *Rhodes v. OHSAA*, 939 F. Supp. 584 (N.D. Ohio 1996). (Doc. 25 at PageID 1047–48.) The Northern District of Ohio analyzed whether OHSAA violated the Rehabilitation Act without any discussion of whether the programs or activities of OHSAA were federally funded.

11

Cir. 1995) (age limits in Michigan).  There are three methods by which a student athlete can establish that a high school athletic association has discriminated against him on the basis of his disability:  (1) by offering evidence that learning disabilities were actually considered by the high school athletic association in formulating or implementing its eligibility rule; (2) by showing that the high school athletic association could have reasonably accommodated his disability, but refused to do so; and (3) by proving a disparate impact upon disabled students.  *McPherson*, 119 F.3d at 460; *see also Washington*, 181 F.3d at 847 (relying on the approach outlined in *McPherson*).

This dispute focuses on the second method of proof, by which a plaintiff can establish an ADA violation without proving intentional discrimination.  The OHSAA argues that because Bylaw 4-6-3 applies to all disabled and non-disabled students without distinction, the rule does not exclude C.S. from participating in interscholastic sports because of his disability but rather solely because he resides in Kentucky.  The second method of proof, however, does not require the Steines to prove that the OHSAA intended to discriminate against C.S. because of his disability.  It is sufficient to establish that the OHSAA could accommodate his disability, but refuses to do so.  The Steines allege that the OHSAA could accommodate C.S.'s disability by granting him a waiver of Bylaw 4-6-3.

An accommodation is reasonable if it does not impose undue financial or administrative burdens upon the entity covered by the ADA and if it does not require a fundamental alteration in the nature of the program.  *McPherson*, 119 F.3d at 461; *Sandison*, 64 F.3d at 1034.  "[A]n individualized inquiry must be made to determine whether a specific modification for a particular person's disability would be reasonable under the circumstances as well as necessary for that person, and yet at the same time not work a fundamental alteration." *PGA Tour*, 532

12

U.S. at 688 (addressing ADA Title III claim); *see also Cruz ex rel. Cruz v. Pa. Interscholastic Athletic Ass'n, Inc.*, 157 F. Supp. 2d 485, 499 (E.D. Pa. 2001) (holding that Title II claims require the same individualized inquiry). In failure to accommodate cases whether the plaintiff is "otherwise qualified" and whether he was excluded from certain activities "solely because of his disability" can represent "two sides of a single coin." *See Washington*, 181 F.3d at 847 (quoting *Alexander v. Choate*, 469 U.S. 287, 300 n.19 (1985)). The "ultimate question is the extent to which a [defendant] is required to make reasonable modifications in its programs for the needs of the [disabled]." *Id.* (quoting *Choate*, 469 U.S. at 300 n.19).

Nonetheless, the Court must examine a preliminary accommodation issue before the Court would consider the more particularized inquiry of whether waiver of the in-state residency rule would impose undue burdens or constitute a fundamental alteration of the OHSAA's athletic programs. The Court must ask whether there is a causal relationship between C.S.'s disability and the application of the in-state residency rule barring him from playing soccer for Summit. *See id.* at 848 (stating there must be a "causal connection" between the disability and the ineligibility). Where such a causal connection or nexus exists, a waiver of the rule would constitute an accommodation of his disability. The regulations administering Title II state that a public entity should make reasonable accommodations to its policies "when the modifications are *necessary* to avoid discrimination *on the basis of the disability*." 28 C.F.R. § 35.130(b)(7) (emphasis added).

An accommodation is generally necessary only "when it allows the disabled to obtain benefits they ordinarily could not have by reason of their disabilities, and not because of some quality they share with the public generally." *Wis. Community Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 754 (7th Cir. 2006); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 276 (2d Cir. 2003)

(same principle). There must be an "identifiable relationship, or nexus, between the requested accommodation and the individual's disability." Joint Statement of The Department of Housing and Urban Development and the Department of Justice, Reasonable Accommodations Under the Fair Housing Act (May 14, 2014); *see also PGA Tour*, 532 U.S. at 688 (stating that Title III of the ADA requires courts to examine whether a requested accommodation is necessary for the disabled person). "Ordinarily, an accommodation of an individual's disability operates so that the *disability* is overcome and the disability no longer prevents the individual from participating." *Sandison*, 64 F.3d at 1035 (emphasis in the original). A plaintiff challenging the eligibility rules of a high school athletic association must establish that "*but for* his learning disability, he would have been eligible to play sports." *Washington*, 181 F.3d at 849 (emphasis added).

C.S. is ineligible to play sports for Summit because his parents live outside of Ohio, not because he is disabled. Because his parents live in Kentucky, C.S. would be ineligible to play sports for Summit even if he was not disabled. Moreover, waiving Bylaw 4-6-3 does not accommodate or overcome C.S.'s learning disability in any way. C.S. cannot establish that "but for" his learning disability, he would be eligible to play Ohio interscholastic sports for Summit.

The Steines want the Court to focus not on their choice to be residents in Kentucky—the fact that creates C.S.'s ineligibility for interscholastic sports under Bylaw 4-6-3—but rather on their choice to send C.S. to high school at Summit in Ohio. The Steines assert that C.S. would attend school in Kentucky, and not at Summit, but for his disability. (Doc. 23 at PageID 820.) The Court cannot accept this premise to the extent that the factual record in this case establishes that Summit is not the only school which could provide the educational services C.S. requires to accommodate his learning disabilities. Ann Munson Steines and Michael Steines both have

14

stated Holy Cross High School in Kentucky could provide C.S. with the services he needs as a disabled student.  (Doc. 22-1 at PageID 464; Doc. 23 at PageID 849, 852–53.)  The services which Summit provides to C.S. to accommodate his ADHD are not unique—services including participation in a resource program, the use of a laptop in the classroom, and tutoring.  These services could be provided to C.S. at other schools in Kentucky and Ohio.  (Doc. 23 at PageID 848, 868, 871, 912).  The other factors which influenced the Steines to choose to enroll C.S. at Summit rather than at Holy Cross—a superior academic reputation and a college placement program which starts in ninth grade—are factors which make Summit a subjectively better school for both disabled and non-disabled students.  For these reasons, the Court cannot conclude that there is a sufficiently close nexus between C.S.'s disability and the reason for his ineligibility under Bylaw 4-6-3 to find disability discrimination.[5]

The Sixth Circuit has stated that disabled Michigan students who exceeded the Michigan High School Athletic Association's eligibility requirements as to age limits and semesters limits were not excluded from participating in sports solely by reasons of their disabilities.  The Sixth Circuit stated that "passage of time" prevented the students from meeting the eligibility requirements.  *McPherson*, 119 F.3d at 460–61; *Sandison*, 64 F.3d at 1033.  The analogy to this case is straightforward.  C.S.'s disability does not prevent him from meeting the in-state residency rule.  The Steines's Kentucky residency prevents C.S. from meeting the eligibility requirement.[6]

---

[5] This is not to say that Summit is not required to accommodate C.S.'s learning disability.  The Court finds only that waiving the in-state residency rule is not necessary to accommodate his disability.

[6] It is true that the Court in *McPherson* went on to consider whether granting the plaintiff an accommodation by waiver of the eight-semester rule would impose undue financial or administrative burdens on the athletic association or require a fundamental alteration of the program.  119 F.3d at 461.  The *McPherson* court, however, examined the issue of whether the plaintiff's disability or the passage of time prevented the student from meeting the eligibility requirement in order to determine whether the MHSAA enforced the facially neutral eligibility rule with an intent to discriminate.  *Id.* at 460–61.  It did not consider the issue for the purpose of determining if there was a causal

15

The Seventh Circuit examined a similar issue in the *Washington* case, but it applied a less strict and more practical analysis. The Indiana High School Athletic Association had a rule that permitted students to play sports only during the eight semesters following the date the student began ninth grade. *Washington*, 181 F.3d at 842. The Seventh Circuit held that a student who dropped out of school for a period of time because of his learning disability, and subsequently became ineligible to play sports after he had re-enrolled in school due to expiration of the semesters limit, was excluded from playing high sports because of his disability. *Id.* at 849. Therefore, the Seventh Circuit found that the plaintiff student could prove that "but for his learning disability, he would have been eligible to play sports" because he "would not have dropped out of school." *Id.* The *Washington* analysis applied to the facts of this case yields a different result.

The Steines have not proven that a causal connection exists here analogous to the causal connection in the *Washington* case.[7] The court in *Washington* found the student had a learning disability, which caused him to drop out of school for a period of time, which directly led to him exceeding the semester eligibility requirement for playing sports when he returned to school. Here, C.S. has a learning disability. The Steines, who have lived in Kentucky as least since C.S. started kindergarten, chose to send C.S. to a special school for disabled students in Ohio starting in first grade. They then mainstreamed C.S. for junior high and high school upon the advice of his teachers. The Steines determined that at least one high school in Ohio, Summit, and one high

---

relationship between the disability and the neutral rule such that a reasonable accommodation would ameliorate the disability. *See Washington*, 181 F.3d at 848–49 (stating that the *McPherson* passage of time holding addressed "only the first intentional discrimination method of proof, not the issue of causation"). The *McPherson* court did not need to separately examine the issue of causation because it held that the requested accommodation was not reasonable.

[7] The Court acknowledges that it reached an initial, tentative conclusion to the contrary in dicta in the Order Granting Preliminary Injunction. (Doc. 13 at PageID 218–19 & n.8.) The Court now has the benefit of additional evidence and briefing.

school in Kentucky, Holy Cross, could provide C.S. with the academic resource services he requires for his disability. The Steines chose to enroll C.S. at Summit in Ohio because it offered resource services in the primary school building and it had a subjectively better academic reputation and college placement program than Holy Cross. (Doc. 22-1 at Page ID 464; Doc. 23 at PageID 839–40.) It is gratuitous for the Court to note that these are valid reasons for any parent to choose a high school for their child. However, the connection between C.S.'s disability and his ineligibility to play sports for Summit is attenuated under these facts. The Steines have not established a sufficiently close nexus between C.S.'s disability and his ineligibility under the OHSAA's in-state residency rule to satisfy "but for" causation. As such, the Court need not proceed to the next step of the analysis to make an individualized inquiry of whether requiring OHSAA to waive the in-state residency requirement would impose undue financial or administrative burdens upon the OHSAA.

The Court is not called upon in this case to judge the wisdom of the in-state residency rule as applied to C.S. The OHSAA has the means to amend its eligibility rules to the benefit of one student or a group of similarly-situated students.[8] Nonetheless, the OHSAA in this instance intends to enforce Bylaw 4-6-3 strictly against C.S. The sole issue before this Court is whether the OHSAA's failure to amend the in-state residency rule or to grant a waiver in favor of C.S. amounts to disability discrimination in violation of federal law. It does not. The "but for" causation of C.S.'s ineligibility is his parents' residency in Kentucky. The Court concludes that the Steines have not established that the OHSAA is discriminating against C.S. by applying Bylaw 4-6-3 to prohibit C.S. from playing interscholastic sports for Summit.

---

[8] The Court notes that the OHSAA passed a referendum issue on May 18, 2015 changing the age limit for participation in high school sports. The passage of the rule occurred after the *Cincinnati Enquirer* published a lengthy article about a Congolese refugee student who would have been ineligible to play soccer for his public high school team under the prior rule. *See* Hannah Sparling, Rule Change Means Refugee Can Play High School Soccer, *Cincinnati Enquirer* (May 19, 2015); Hannah Sparling, From the Congo to Cincy: A Refugee's Plea to Play, *Cincinnati Enquirer* (April 25, 2014).

**IV.	CONCLUSION**

For the foregoing reasons, the Court will not issue a permanent injunction against the OHSAA.  Additionally, the Order Granting Preliminary Injunction (Doc. 13) is hereby **VACATED**.

IT IS SO ORDERED.

S/Susan J. Dlott_____
Judge Susan J. Dlott
United States District Court
